23CA1395 Peo v Silveira-Monreal 07-09-2026

COLORADO COURT OF APPEALS

---

Court of Appeals No. 23CA1395
City and County of Denver District Court No. 22CR1819
Honorable Darryl F. Shockley, Judge

---

The People of the State of Colorado,

Plaintiff-Appellee,

v.

Efrain Silveira-Monreal,

Defendant-Appellant.

---

JUDGMENT AFFIRMED

Division V
Opinion by JUDGE YUN
Lipinsky and Schutz, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced July 9, 2026

---

Philip J. Weiser, Attorney General, Cata A. Cuneo, Assistant Attorney General, Denver, Colorado, for Plaintiff-Appellee

Megan A. Ring, Colorado State Public Defender, Stephen Arvin, Deputy State Public Defender, Denver, Colorado, for Defendant-Appellant

¶ 1     Efrain Silveira-Monreal appeals the judgment of conviction entered after a jury found him guilty of one count of sexual assault on a child by one in a position of trust — victim less than fifteen years of age, committed as part of a pattern of sexual abuse — and one count of sexual assault on a child committed as part of a pattern of sexual abuse.  He contends that (1) the prosecutor improperly bolstered the victim's credibility during voir dire, opening statement, and closing argument; (2) the district court improperly instructed the jury on reasonable doubt; and (3) the cumulative effect of these alleged errors deprived him of a fair trial. We disagree with these contentions and therefore affirm the judgment.

## I.     Background

¶ 2     The victim, who was twenty-one years old at the time of trial, testified that her maternal uncle, Silveira-Monreal, touched her vagina and buttocks over her clothing multiple times when she was eight and nine years old.  She testified that she initially kept the touching a secret out of fear that no one would believe her or, if they did, her father might react violently towards her or Silveira-

Monreal.  She eventually disclosed the abuse to her cousin and her mother.

¶ 3    The victim's cousin testified that the victim disclosed the sexual abuse during a sleepover.  The victim's mother testified that she did not contact law enforcement at the time because she did not want her daughter to "suffer . . . more psychological harm." Years later, the abuse was reported to law enforcement when the victim sought mental health treatment for panic attacks and suicide prevention.

¶ 4    Silveira-Monreal did not testify at trial.  His theory of defense was that the investigation was inadequate and that an alternate suspect had abused the victim.  The jury found Silveira-Monreal guilty of both sexual assault counts noted above, and the district court sentenced him to twelve years to life in the custody of the Department of Corrections.

¶ 5    Silveira-Monreal now appeals.

## II.    Prosecutorial Misconduct

¶ 6    Silveira-Monreal contends that the prosecutor committed misconduct by using voir dire for improper purposes and improperly referencing voir dire discussions during opening

statement and closing argument. He further contends that the cumulative effect of these alleged errors requires reversal. We disagree.

## A. Additional Background

¶ 7 During jury selection, three prospective jurors disclosed in open court that they had been victims of childhood sexual assault by a family member. Additionally, sixteen jurors disclosed on their juror questionnaires that they, or someone close to them, had been a victim of childhood sexual assault. And twenty-one jurors indicated that they, or someone close to them, had been a victim of sexual assault as an adult.

¶ 8 During voir dire, the prosecutor asked prospective jurors if any of them liked "watching true crime" shows and, specifically, if any of them watched shows "where they talk about crimes that happened a long time ago." After seeing some heads nod, the prosecutor asked if any of the jurors — regardless of whether they watched true crime shows — knew "what some of the challenges are on some of the old cases for the [p]rosecution and law enforcement . . . when it comes time to prove them." The jurors named challenges regarding "[m]emory," changes in testimony over time, and "chain of

custody." The prosecutor asked if "availability of witnesses" could also be a challenge, to which a juror replied, "Absolutely."

¶ 9 The prosecutor then asked if there was "anybody on here who if presented with a really, really old case would say . . . that's really going to be too old for me to be able to find something beyond a reasonable doubt here?" When no jurors raised their hands, the prosecutor asked if the jurors thought that sexual assault cases usually had "a lot of witnesses" or "videotapes," and she noted that she saw "heads shaking no." She asked if it was possible to have a sexual assault "situation where there's no DNA," and she noted that she saw "nods yes."

¶ 10 The prosecutor then asked if, in "a case with no video, no eyewitness, no DNA," there was

> anyone here who just . . . is thinking, you know, I don't think that I could find beyond a reasonable doubt that a sexual assault of a child occurred unless I had one of those, unless there was a witness, a video, or DNA? . . . [A]s you sit here today, in all honesty thinking in your heart, you're faced with sexual assault of a child case with no DNA, no video, no eyewitnesses, is there anybody right now without hearing any of the evidence in this case says, . . . no[] matter what you do, Ms. Prosecutor, there's no way I'm going to be

4

> able to find beyond a reasonable doubt that
> this happened?

Several jurors raised their hands, and the prosecutor followed up with each of them, asking if they would hold her "to a higher burden of proof" than "beyond a reasonable doubt."  Three jurors confirmed they would.

¶ 11     Next, the prosecutor told the jurors that, if selected for the jury,

> you're going to have a really important job of
> being the judges of the credibility of the
> witnesses who are going to take this stand
> right here.  And you will be able to ask yourself
> if they have anything to gain or if they have
> anything to lose.  You will be able to see their
> demeanor.

Returning to the issue of credibility, the prosecutor later asked why "people make things up," and jurors volunteered "[r]evenge" and being "confused."  The prosecutor asked if people "sometimes make up things . . . when there's a benefit."  The record does not indicate whether any jurors responded nonverbally.

¶ 12     The prosecutor also asked if anyone knew "what some reasons might be for why a child would not report their abuse right away."  Jurors volunteered that a child might not report abuse because

5

they were "young, innocent, scared," "nervous," "traumatized," afraid of retaliation, or ashamed; because they had been "[t]hreatened" or did not understand "that what is being done . . . is not right," especially if the abuser was a family member; or because "maybe the other parent or caretaker wouldn't believe them, and so it's better to stay silent and try to be safe."

¶ 13     Defense counsel did not object to any of these questions.

¶ 14     During her opening statement, the prosecutor explained that the jury would be responsible for judging the victim's credibility and noted that, as discussed during voir dire, a relevant consideration was whether the victim had anything to gain from her allegations:

> Remember in jury selection we talked about credibility and why would people make things up. Maybe they have some motive or maybe they have something to gain. When you're evaluating [the victim] on the stand, when you're judging her credibility, ask yourself what on earth does she have to gain to come here all these years later, take the stand, be cross-examined about some of the most painful things that happened to her in her young life.

¶ 15     The prosecutor also referenced the voir dire discussion about the challenges of proving a case without video or DNA evidence:

Now this type of case, you heard several people on the panel yesterday just briefly say without getting into details that they had been sexually molested at the hands of a family member. And you heard us talk about what about cases where there's no DNA?  What about cases where there's no webcam?  What about those cases?  And you heard at least three people tell me, You're going to have a tough time, you're going to have a tough time.

But they're not wrong.  In this type of case, there's no Nest camera in the house recording what's going on in the kitchen, in the living room, in the bedroom, which are the three rooms they expect you're going to hear the offenses were happening in.

There's no DNA.  You haven't heard a lot about the facts yet because in jury selection we're not allowed to tell you.  But the facts in this case are that he was touching her genitals with his hand over her clothes, trying to get under her clothes.  This is not a penetration case. . . . Even if this case had gone to law enforcement back in 2011, there still wouldn't be any DNA in this type of case.  It's a sexual contact case. And it is a crime. . . .  You touch a child on her genitals over her clothing, even over her clothing, it is a crime.

¶ 16    Defense counsel did not contemporaneously object, and the

prosecutor's opening statement continued for three and a half more

pages of transcript.  When she concluded her opening statement,

defense counsel asked to approach the bench, and the following colloquy took place:

> [DEFENSE COUNSEL]: I would just like to make an objection to the reference of *victims*. In the jury selection process, the mention bolstered the credibility of the witness in this case, calls opening to harken back to what those people said in jury selection is improper. Opening is supposed to be based on what you anticipate to come in as evidence in this case, and we just wanted to make that brief record.
>
> THE COURT: Okay.

Defense counsel did not ask the court to strike any portions of the prosecutor's opening statement.

¶ 17    The next day, in closing argument, the prosecutor called the jurors' attention to certain evidence they had heard. As relevant here, she noted that

- "When [the victim] first told her cousin [about the sexual abuse], she just told her a little bit about it. As she got more comfortable and felt more safe, she was able to tell more."

- When the prosecutor asked the victim's mother if she called the police, the mother said she did not because

she was afraid that doing so would cause her daughter more mental stress.

- When the prosecutor asked the victim if she had wanted to call the police when she was a child, the victim said she did not want to because she was scared her father might react violently.

### B. Governing Law and Standard of Review

¶ 18    We engage in a two-step analysis when reviewing claims of prosecutorial misconduct. *Wend v. People*, 235 P.3d 1089, 1096 (Colo. 2010).

¶ 19    First, we determine whether the conduct was improper based on the totality of the circumstances. *Id.* "[W]e evaluate claims of improper argument in the context of the argument as a whole and in light of the evidence before the jury." *People v. Sellers*, 2022 COA 102, ¶ 23, *aff'd on other grounds*, 2024 CO 64. Because "arguments delivered in the heat of trial are not always perfectly scripted," we give the prosecutor the benefit of the doubt when their remarks are "ambiguous or simply inartful." *People v. Samson*, 2012 COA 167, ¶ 30.

¶ 20    Next, if we identify misconduct, we determine whether it warrants reversal under the applicable standard of review. *Wend*, 235 P.3d at 1096. We review unpreserved claims of prosecutorial misconduct for plain error. *People v. Licona-Ortega*, 2022 COA 27, ¶ 88. "Plain error addresses error that was obvious and substantial and that so undermined the fundamental fairness of the trial itself as to cast serious doubt on the reliability of the judgment of conviction." *People v. Robinson*, 2019 CO 102, ¶ 19. "In the context of plain error review of prosecutorial misconduct, we will only reverse when the misconduct was 'flagrantly, glaringly, or tremendously improper.'" *Id.* (quoting *Domingo-Gomez v. People*, 125 P.3d 1043, 1053 (Colo. 2005)).

## C.    Voir Dire

¶ 21    Silveira-Monreal contends that the prosecutor committed misconduct during voir dire in two ways: first, by "elicit[ing] personal knowledge from prospective jurors which furthered [the prosecution's] theory that [the victim] was credible," and second, by arguing "that a victim won't make a false accusation absent a 'benefit.'" We conclude that any error was not plain.

10

¶ 22    "The purpose of voir dire examination is to enable counsel to determine whether any prospective jurors are possessed of beliefs which would cause them to be biased in such a manner as to prevent the counsel's client from obtaining a fair and impartial trial." *People v. Collins*, 730 P.2d 293, 300 (Colo. 1986).  District courts generally afford counsel wide latitude in conducting voir dire. *See Smartt v. Lamar Oil Co.*, 623 P.2d 73, 76 (Colo. App. 1980) ("[C]ounsel must be given considerable latitude to make [voir dire] examination in good faith . . . .").

¶ 23    Silveira-Monreal argues that the prosecutor improperly asked jurors about why "older sexual-assault cases . . . suffer from a scarcity of evidence."  But the prosecutor's questions about the availability of evidence in sexual assault cases were framed within a discussion of the reasonable doubt standard in criminal prosecutions.  Indeed, several jurors acknowledged that they could not find beyond a reasonable doubt that a sexual assault occurred in a "case with no DNA, no video, no eyewitnesses."  Such inquiries are proper.  *See Jackson v. State*, 177 So. 3d 911, 925 (Ala. Crim. App. 2014) (upholding voir dire discussion of how the jury would view a lack of the scientific and physical evidence often seen in

11

crime shows because "the State was entitled to know whether any member of the venire would negatively view a case in which there would be little scientific evidence"); *Commonwealth v. Perez*, 954 N.E.2d 1, 10 (Mass. 2011) (holding that the trial judge did not abuse his discretion by questioning the venire about their views on scientific evidence — specifically, whether "the Commonwealth is never able to prove a case beyond a reasonable doubt unless it presents scientific evidence to corroborate witness testimony" — because the question was "tailored to ensure that seated jurors were capable of deciding the case without bias and based on the evidence").

¶ 24 Silveira-Monreal further argues that the prosecutor improperly asked jurors about why "someone in [the victim's] position might not report the alleged abuse to the police." But again, the prosecutor's questions about why a child might delay reporting sexual abuse were intended to determine whether prospective jurors held biases relevant to this case. Because the victim's credibility was a central issue at trial, the prosecutor was entitled to explore whether any prospective jurors had preconceived biases

about a child victim who kept abuse secret. *See Collins*, 730 P.2d at 300.

¶ 25    We recognize that, as Silveira-Monreal notes, the prosecution sometimes introduces expert testimony to explain the reasons why a child might not report sexual abuse right away. *See People v. Morrison*, 985 P.2d 1, 3, 5 (Colo. App. 1999) (holding that expert testimony regarding "the common patterns of disclosure of sexual abuse by children, including delayed reporting," is admissible), *aff'd*, 19 P.3d 668 (Colo. 2000). But that does not mean that the prosecution is required to introduce such expert testimony. And it does not mean that a prosecutor is precluded from asking prospective jurors questions about why a child might delay reporting. *See People v. Wilson*, 2014 COA 114, ¶ 67 ("It is not expected that jurors should leave their common sense and cognitive functions at the door . . . . Nor is it expected that jurors should not apply their own knowledge, experience, and perceptions acquired in the everyday affairs of life . . . ." (citation omitted)).

¶ 26    Finally, Silveira-Monreal argues that the prosecutor used voir dire to "improperly instruct the jury on the theory that a victim won't make a false accusation absent a 'benefit.'" Specifically, he

argues that the district court should not have permitted the prosecutor to (1) say that the jurors could "ask [themselves] if [witnesses] have anything to gain or if they have anything to lose" and (2) ask the jurors if people "sometimes make up things . . . when there's a benefit."

¶ 27    It is improper for a prosecutor to use voir dire to "argue[] the prosecution's case to the jury." *People v. Carter*, 2015 COA 24M-2, ¶ 71. But here, the prosecutor's remarks about witness credibility were general and were not tied to specific facts of the case. Suggesting that jurors consider what a witness might gain or lose by testifying simply echoed the court's standard credibility instruction and encouraged jurors to use their common sense. *See* COLJI-Crim. E:05 (2025) (instructing the jury to consider the witness's motive, any relationship the witness may have to either side, and how each witness might be affected by the verdict); *People v. Marin*, 686 P.2d 1351, 1355-56 (Colo. App. 1983) ("[T]he jury's very function is to use its 'common sense and ordinary experience' in evaluating the evidence." (citation omitted)).

¶ 28    Moreover, to the extent any of the prosecutor's remarks were improper, the misconduct was not "so obvious that a trial judge

14

should [have] be[en] able to avoid it without the benefit of an objection." *Scott v. People*, 2017 CO 16, ¶ 16. An obvious error ordinarily "must contravene (1) a clear statutory command; (2) a well-settled legal principle; or (3) Colorado case law." *Id.* (citation omitted). The challenged discussions were aimed at identifying potential juror biases, the proper purpose of voir dire. *See Collins*, 730 P.2d at 300. Nor did any error "so undermine[] the fundamental fairness of the trial as to cast serious doubt on the reliability of the judgment of conviction." *Robinson,* ¶ 19; *see People v. Shipman*, 747 P.2d 1, 3 (Colo. App. 1987) (holding that the defendant "failed to show any prejudice" from the prosecutor's improper voir dire questions "designed . . . to give greater credence to police officers' testimony" because the court "carefully instructed the jurors on the weight and credibility to be given the evidence adduced").

¶ 29     We thus conclude that no plain error occurred during voir dire.

### D.    Opening Statement

¶ 30     Silveira-Monreal contends that the prosecutor committed misconduct in her opening statement in three ways: (1) by

"capitaliz[ing]" on the theory, improperly introduced during voir dire, "that a victim won't make a false accusation absent a 'benefit'"; (2) by referencing "several people on the panel yesterday" who "had been sexually molested at the hands of a family member"; and (3) by introducing "extraneous evidence" from voir dire concerning "the prospective jurors' experience with sexual assaults and their true-crime knowledge . . . concerning older sexual-assault cases, specifically information that such cases inevitably suffer from a scarcity of evidence." We again conclude that any error was not plain.

¶ 31 As an initial matter, we disagree with Silveira-Monreal's contention that his claims of prosecutorial misconduct during opening statement are preserved. Defense counsel did not contemporaneously object to the challenged statements but raised the issue only after the prosecutor finished her opening statement. *See People v. Martinez Rubier*, 2024 COA 67, ¶ 64 ("It is through objections that a court is alerted to an issue requiring its attention. The objection must be contemporaneous; '[w]here a claim of error is not preserved by a contemporaneous objection, we may reverse only if plain error occurred.'" (citations omitted)). And defense counsel

did not request any ruling or relief — such as to strike any portion of the improper statement — but instead stated only that the defense "just wanted to make that brief record."  Accordingly, the district court did not rule on the objection but simply said, "Okay." *See Martinez v. People*, 244 P.3d 135, 139 (Colo. 2010) ("At trial, the purpose of an objection is not only to express disagreement with a proposed course of action, but also to 'afford[] the judge an opportunity to focus on the issue and hopefully avoid the error.'" (quoting *Am. Fam. Mut. Ins. Co. v. DeWitt*, 218 P.3d 318, 325 (Colo. 2009))).  We thus review Silveira-Monreal's claims of misconduct during opening statement for plain error.

¶ 32    As to Silveira-Monreal's argument that the prosecutor "capitalized" on an improperly introduced theory regarding possible motivations for providing false testimony, we have already concluded that the prosecutor did not commit misconduct during voir dire by suggesting that the jurors think critically about a witness's reasons for testifying.  The prosecutor's remarks during her opening statement — encouraging the jurors to ask themselves "what on earth" the victim had "to gain" by coming to court "all these years later," taking the stand, and being cross-examined

17

about painful experiences — similarly appealed to the jurors' common sense. Accordingly, the remarks were not improper.

¶ 33 However, we agree with Silveira-Monreal that the prosecutor's reference to juror disclosures of sexual abuse by family members was improper. The implication of the comment was that childhood sexual abuse is common and that the victim was therefore likely telling the truth. But the prosecutor did not draw that inference or indeed make any argument regarding the disclosures — she made a single, brief reference to them and moved on. We thus conclude that the fleeting improper comment does not rise to plain error. *See People v. Garner*, 2015 COA 175, ¶ 59 ("[T]he prosecutor's single use of the word 'lie,' even if inappropriate, was not so flagrantly, glaringly, or tremendously improper as to rise to the level of plain error."), *aff'd*, 2019 CO 19; *People v. Gibson*, 203 P.3d 571, 577 (Colo. App. 2008) ("Comments that are few in number and momentary in length do not normally warrant reversal under the plain error standard.").

¶ 34 Finally, Silveira-Monreal argues that the prosecutor improperly introduced "extraneous evidence" from voir dire regarding the likely unavailability of video, eyewitness, and DNA

evidence in older sexual assault cases. But the only juror comment referenced in this regard was that the prosecutor was "going to have a tough time" proving the case. Read in context, the prosecutor's remarks did not introduce evidence but rather emphasized the lack of certain types of evidence in this case. Her point was not only that the assaults were not caught on camera but that, "[e]ven if this case had gone to law enforcement" when the victim was nine years old, there would still be no DNA evidence because the victim was not alleging penetrative sex. The prosecutor's focus was on reminding the jurors that the charged conduct, even though it involved touching the victim over her clothes, was a crime.

¶ 35    We thus conclude that no plain error occurred during the prosecutor's opening statement.

### E.    Closing Argument

¶ 36    Silveira-Monreal also contends that the prosecutor introduced extraneous evidence from voir dire during closing argument. Specifically, he argues that the prosecutor committed misconduct because "the reasons for a delayed outcry introduced by the prospective jurors [during voir dire] were the same reasons used by

the prosecution in closing argument to explain why [the victim] and her mother didn't report earlier."

¶ 37    It is true that the prosecutor asked prospective jurors during voir dire "why a child would not report their abuse right away" and that jurors volunteered answers including a child's youth, innocence, nervousness, trauma, fear of retaliation, and fear of not being believed.  But in closing argument, the prosecutor did not reference these concepts in the abstract.  Rather, she called the jury's attention to specific trial evidence — the victim's testimony that she confided more in her cousin as she felt more comfortable; the victim's mother's testimony that she believed reporting the assaults would cause her daughter greater distress; and the victim's testimony that she was afraid her father might react violently if she disclosed the assaults.  None of the challenged statements referenced the jurors' comments during voir dire; rather, they were firmly grounded in the evidence.  As such, they were not improper.

### F.    Cumulative Error

¶ 38    Silveira-Monreal contends that, even if the individual instances of alleged prosecutorial misconduct do not require

20

reversal, their cumulative prejudicial impact does. "For reversal to occur based on cumulative error, a reviewing court must identify multiple errors that collectively prejudice the substantial rights of the defendant, even if any single error does not." *Howard-Walker v. People*, 2019 CO 69, ¶ 25. Because we have concluded that only one error occurred and that it did not rise to the level of plain error, we reject Silveira-Monreal's cumulative error argument. *See People v. Thames*, 2019 COA 124, ¶ 69 ("Even assuming that the trial court erred once, a single error is insufficient to reverse under the cumulative error standard.").

## III.   Jury Instruction

¶ 39   Silveira-Monreal contends that the district court reversibly erred by giving the 2022 model criminal jury instruction on reasonable doubt because that instruction lowered the prosecution's burden of proof. We disagree.

### A.   Additional Background

¶ 40   In 2022, the Model Criminal Jury Instructions Committee revised the model instruction for reasonable doubt. *People v. Melara*, 2025 COA 48, ¶ 12. In addition to modifying the reasonable doubt instruction, the committee combined it and the

21

presumption of innocence instruction into a single new instruction. *See* COLJI-Crim. E:03 (2022).

¶ 41    Before the 2022 revision, the model reasonable doubt instruction read as follows:

> Reasonable doubt means a doubt based upon reason and common sense which arises from a fair and rational consideration of all of the evidence, or the lack of evidence, in the case. It is a doubt which is not a vague, speculative or imaginary doubt, but such a doubt as would cause reasonable people to hesitate to act in matters of importance to themselves.
>
> If you find from the evidence that each and every element of a crime has been proven beyond a reasonable doubt, you should find the defendant guilty of that crime. If you find from the evidence that the prosecution has failed to prove any one or more of the elements of a crime beyond a reasonable doubt, you should find the defendant not guilty of that crime.

COLJI-Crim. E:03 (2021).

¶ 42    At trial, defense counsel tendered the pre-2022 instruction for the burden of proof and definition of reasonable doubt and objected to the 2022 instruction. Defense counsel argued that the 2022 instruction undermined the presumption of innocence and lowered the burden of proof.

¶ 43    Over defense counsel's objections, the district court gave the

2022 instruction at trial:

> Every person charged with a crime is
> presumed innocent.  This presumption of
> innocence remains with the defendant
> throughout the trial and should be given effect
> by you unless, after considering all the
> evidence, you are convinced that the defendant
> is guilty beyond a reasonable doubt.
>
> The burden of proof in this case is upon the
> prosecution.  The prosecution must prove to
> the satisfaction of the jury beyond a
> reasonable doubt the existence of each and
> every element necessary to constitute the
> crime charged.  This burden requires more
> than proof that something is highly probable,
> but it does not require proof with absolute
> certainty.
>
> Proof beyond a reasonable doubt is proof that
> leaves you firmly convinced of the defendant's
> guilt.  If you are firmly convinced of the
> defendant's guilt, then the prosecution has
> proven the crime charged beyond a reasonable
> doubt.  But if you think there is a real
> possibility that the defendant is not guilty,
> then the prosecution has failed to prove the
> crime charged beyond a reasonable doubt.
>
> After considering all the evidence, if you decide
> the prosecution has proven each of the
> elements of a crime charged beyond a
> reasonable doubt, you should find the
> defendant guilty of that crime.

> After considering all the evidence, if you decide
> the prosecution has failed to prove any one or
> more of the elements of a crime charged
> beyond a reasonable doubt, you should find
> the defendant not guilty of that crime.

¶ 44 Further, during voir dire, the district court orally instructed the jury that

> [t]he decision of the [d]efendant not to testify
> cannot be used as an inference of guilt and
> cannot prejudice the defendant.  It is not
> evidence, does not prove anything, and you
> must not consider it for any purpose.
>
> Sympathy and prejudice have no place in a
> criminal trial.  The guilt or innocence of the
> [d]efendant must not be decided as a result of
> either sympathy or prejudice for or against the
> [p]rosecution or the [d]efendant.
>
> This case must be decided only on the
> evidence presented at trial and the law as I
> instruct you.

### B.    Governing Law and Standard of Review

¶ 45 The Due Process Clause of the United States Constitution "protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *Tibbels v. People*, 2022 CO 1, ¶ 23 (quoting *In re Winship*, 397 U.S. 358, 364 (1970)).

24

¶ 46　　The district court must properly instruct the jury on the reasonable doubt standard. *Id.* at ¶ 25. Although the court has some flexibility in how it defines reasonable doubt, an instruction that lowers the prosecution's burden of proof below that standard constitutes structural error requiring automatic reversal. *People v. Schlehuber*, 2025 COA 50, ¶ 13.

¶ 47　　To determine whether an instruction impermissibly lowered the burden of proof, we apply a "functional test, asking whether there is a reasonable likelihood that the jury understood [the] contested instruction, in the context of the instructions as a whole and the trial record, to allow a conviction based on a standard lower than beyond a reasonable doubt." *Tibbels*, ¶ 36. The district court has broad discretion to determine the form and style of instructions as long as they properly inform the jury of the law. *McDonald v. People*, 2021 CO 64, ¶ 54. Thus, there is no due process violation if the instructions as a whole correctly inform the jury of the prosecution's burden to prove the charged offense beyond a reasonable doubt. *Johnson v. People*, 2019 CO 17, ¶ 14.

¶ 48　　We review de novo whether a district court accurately instructed the jury on the law. *Id.* at ¶ 8.

## C. Discussion

¶ 49 Like the defendant in *Schlehuber,* Silveira-Monreal challenges four aspects of the 2022 model jury instruction that the district court gave: (1) the instruction did not inform the jury that it could consider the "lack of evidence" supporting the prosecution's case; (2) it omitted the "hesitate to act" phrase found in the previous version of the reasonable doubt instruction; (3) it equated reasonable doubt with "a real possibility that the defendant is not guilty"; and (4) it used the phrase "firmly convinced" in contrast to "real possibility" to define proof beyond a reasonable doubt.[1] *Schlehuber,* ¶ 16.

¶ 50 We first reject Silveira-Monreal's argument that removing the "lack of evidence" language from the 2022 model instruction lowered or shifted the burden of proof or undermined the presumption of innocence. Five divisions of this court have concluded that removing the "lack of evidence" instruction from the

---

[1] Silveira-Monreal also asserts that the cumulative effect of these errors lowered and shifted the prosecution's burden of proof. *See People v. Schlehuber,* 2025 COA 50, ¶ 35. For the same reasons we conclude that none of the claimed errors individually lowered the burden of proof, we conclude they did not do so cumulatively. *See id.*

2022 model instruction did not lower the prosecution's burden of proof. *Schlehuber*, ¶ 20; *Melara*, ¶ 24; *People v. Berumen*, 2025 COA 93, ¶ 33; *People v. Simms*, 2026 COA 51, ¶ 22; *People v. Crow*, 2026 COA 53, ¶ 16. Further, the return of "lack of evidence" in the 2023 model instruction does not mean that its omission from the 2022 model instruction "unconstitutionally lower[ed] the prosecution's burden of proof below the reasonable doubt standard." *Schlehuber*, ¶¶ 18 n.2, 25.

¶ 51    Moreover, Silveira-Monreal's argument that, without the "lack of evidence" language, the jury had no guidance about how to address evidentiary gaps in the prosecution's case does not withstand scrutiny when the instruction is read as a whole. *Id.* at ¶¶ 19-23. As the *Schlehuber* division explained, the 2022 model instruction does not preclude the jury from considering the prosecution's lack of evidence because this concept is incorporated within the 2022 instruction. *Id.* at ¶ 22. The jury was told that the prosecution bears the burden of proof and that the defendant is presumed innocent unless the prosecution meets its burden. *See id.* Additionally, the last paragraph of the court's instruction told the jury to consider "all the evidence" when determining whether

the prosecution met its burden of proof: "After considering all the evidence, if you decide the prosecution has failed to prove any one or more of the elements of a crime charged beyond a reasonable doubt, you should find the defendant not guilty of that crime." Thus, the "fail[ure] to prove" language informed the jury that it should return a not guilty verdict if a material gap existed in the prosecution's proof.

¶ 52 We are not persuaded otherwise by Silveira-Monreal's argument that this case differs from *Melara* and *Schlehuber* because, in this case, the district court instructed the jurors during voir dire that the case "must be decided only on the evidence presented at trial." Silveira-Monreal argues those cases are distinguishable because the lack of evidence was central to his defense at trial. Specifically, he points to the absence of (1) a contemporaneous outcry; (2) DNA evidence linking him to any assault; (3) video of the assaults; and (4) testimony from law enforcement or mandatory reporters. But this argument presupposes a conclusion that the court's instructions, either individually or collectively, lowered the burden of proof. We, like prior divisions, reject this conclusion.

28

¶ 53    Moreover, the court gave the instruction that the case "must be decided only on the evidence presented at trial" immediately after telling the jury that a defendant's decision not to testify was not evidence and that sympathy and prejudice have no place in a criminal trial.  Accordingly, the court was instructing the jury that it could *not* base its decision on sympathy, prejudice, or an inference of guilt from Silveira-Monreal's decision not to testify.  Considering "the context of the instructions as a whole," *id.* at ¶ 13 (quoting *Tibbels*, ¶ 36), the jurors would have understood that the court was not prohibiting them from considering gaps in the prosecution's proof.

¶ 54    Likewise, removing the "hesitate to act" language did not deprive the jury of necessary context to understand and apply the concept of reasonable doubt.  We, like the *Schlehuber* division, conclude that removal of the "hesitate to act" language does not lower the prosecution's burden of proof "so long as the instruction otherwise correctly defines the reasonable doubt standard."  *Id.* at ¶ 28.  The 2022 instruction defines reasonable doubt using the phrases "firmly convinced" and "real possibility."  As the *Schlehuber* court explained, "'[F]irmly convinced' correctly connotes a standard

of 'near certitude' — one that is higher than 'highly probable' but stops short of absolute certainty" — and the phrase "real possibility" instructs the jury not to acquit "simply because it can conceive of *some* fanciful possibility that the defendant is not guilty." *Id.* at ¶ 31 (citation omitted). Like the *Schlehuber* division, we disagree that

> the two challenged phrases are "contradictory" or "create two different standards." Rather, the phrases work together to give the jury a complete picture of the reasonable doubt standard. The first — "firmly convinced — describes what it means to have no reasonable doubt. The second — "real possibility" — contrasts that with what it means to have a reasonable doubt. In other words, the jury could either be "firmly convinced" of Schlehuber's guilt (and find him guilty) or "think there is a real possibility" that Schlehuber was not guilty (and find him not guilty). Both things could not be true.

*Id.* at ¶ 33. We therefore conclude that the 2022 model instruction did not impermissibly lower the prosecution's burden to prove the charged offense beyond a reasonable doubt.

¶ 55 We are not persuaded otherwise by Silveira-Monreal's argument that referencing a "real possibility" that the defendant was not guilty lowered or shifted the burden of proof or undermined

30

the presumption of innocence.  As the *Schlehuber* division concluded, equating reasonable doubt with a "real possibility" does not shift the burden to the defendant to prove that real possibility. *Id.* at ¶ 34.  The court's instruction here stated that if the jury believes "there is a real possibility that the defendant is not guilty, then the prosecution has failed to prove the crime charged beyond a reasonable doubt."  Additionally, the instruction correctly informed the jury that it was required to presume that the defendant was innocent, that the burden of proof lay with the prosecution, and that the prosecution had to prove every element of the charged crime beyond a reasonable doubt.

¶ 56     We further disagree with Silveira-Monreal's contention that the "firmly convinced" language defines a level of certitude below the beyond a reasonable doubt standard.  Five divisions of this court have already concluded that the "firmly convinced" phrase does not lower the burden of proof.  *Melara,* ¶ 30; *Schlehuber,* ¶¶ 30-32; *Berumen,* ¶¶ 22-25; *Simms,* ¶¶ 30-32; *Crow,* ¶ 16.

¶ 57     Because we conclude that the 2022 model jury instruction did not lower the prosecution's burden of proof, it follows that the

31

district court did not violate Silveira-Monreal's due process rights by giving this instruction to the jury.

## IV. Cumulative Error

¶ 58 Silveira-Monreal contends that, even if the individual alleged errors do not require reversal, their cumulative prejudicial impact does. *See Howard-Walker*, ¶ 25. Because we have concluded that any prosecutorial misconduct did not rise to the level of reversible plain error and that the district court did not err by giving the 2022 model jury instruction, we reject Silveira-Monreal's cumulative error argument.

## V. Disposition

¶ 59 We affirm the judgment.

JUDGE LIPINSKY and JUDGE SCHUTZ concur.